UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

NANCY SPAHR and                    )
BARBARA TREADWAY,                  )
on behalf of themselves and all    )
other similarly situated,          )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )        NO. 2:07-CV-187
                                   )
LEEGIN CREATIVE LEATHER            )
PRODUCTS, INC.                     )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION

This class action complaint is before the Court on the motion of the defendant to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), [Doc. 3]. The plaintiffs have responded in opposition, [Doc. 17], and defendant has filed a reply brief in support of its motion to dismiss, [Doc. 20]. The matter is now ripe for disposition. For the reasons which follow, the motion to dismiss will be granted.

## I.    Procedural Background

Plaintiffs, purchasers of retail products manufactured and distributed by the defendant, filed their complaint against defendant on August 9, 2007, on behalf of themselves and all others similarly situated in the United States (the "Direct Purchaser Class") and all others similarly situated in Tennessee (the "Indirect Purchaser Class").

The plaintiffs allege violations of section 4 of the Clayton Act, 15 U.S.C. § 15(a), section 1 of the Sherman Act, 15 U.S.C. § 1, violation of the Tennessee Trade Practices Act, T.C.A. § 47-25-101 *et seq.,* and a state common law action for unjust enrichment. The defendant responded to the complaint on October 22, 2007, with a motion to dismiss, [Doc. 3]. On December 4, 2007, plaintiffs filed their "First Amended Class Action Complaint," ["FAC"], [Doc. 16], and on December 7, 2007, responded to the motion to dismiss, [Doc. 17].

## II. Standard of Review

In deciding a defendant's motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in the light most favorable to the plaintiffs [and] accept all well-pled factual allegations as true." *League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). While this standard is "decidedly liberal," it nonetheless "require[s] more than bare assertions of legal conclusion." *Id.*

In the aftermath of the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Sixth Circuit has explained that a plaintiff's allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *Bredesen*, 500 F.3d at 527. Moreover, the plaintiffs' "obligation to provide the 'grounds' of their entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action." *Id.* "To state a valid claim, a complaint must

contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Id.* In the context of an antitrust case, the Supreme Court has held that the complaint must contain

> enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement . . . [A]nd allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

*Twombly*, 127 S. Ct. at 1964-66. This standard was set by the Supreme Court in antitrust cases because such cases frequently cause substantial expenditures and give the plaintiff the opportunity to extort large settlements even where the plaintiff does not have much of a case. *Id.* at 1966-67. In other words, "[s]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Id.* (quoting *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F.Supp.2d 986, 995 (N.D. Ill. 2003) (Posner, J., sitting by designation)).

## III.   Facts.

The following facts, taken as true for the purpose of this Rule 12(b)(6) motion, are from the plaintiffs' memorandum in opposition to the motion to dismiss:

> Leegin Creative Leather Products ("Defendant") launched the Brighton brand in 1991 with a single collection of belts. That collection has since expanded into a variety of women's fashion

3

accessories, including handbags, wallets, watches, footwear, fragrance, jewelry, home accessories and eye wear, see Amended Complaint, ¶14, sold across the United States in approximately 6,000 stores. There are also approximately 100 all-Brighton Collectible Stores located from coast-to-coast. Amended Complaint, ¶14. While the Defendant manufactures and sells Brighton-brand products to independent retailers, it also owns and operates the largest Brighton Collectible Stores, which account for a substantial share of Defendant's total sales. Amended Complaint, ¶22.

Defendant refers to its Brighton-brand as "one-of-a-kind ornamentation," stating that "Brighton is the only major accessories line featuring products that coordinate from head to toe." Amended Complaint, ¶23. Brighton-brand products are unique, distinct and characterized by an inelasticity of demand. Amended Complaint, ¶51. Many consumers do not consider other accessories as suitable substitutes for the Brighton-brand. Amended Complaint, ¶50. Thus, Plaintiffs lack a comparable product line from which to choose. Amended Complaint, ¶23.

In or about 1997, Defendant instituted a minimum resale pricing policy (the "Brighton Retail Pricing and Promotional Policy") through which it induced retailers to sign and return a "Brighton Pledge" form agreeing to abide by Defendant's pricing policy and pledging to "Follow the Brighton Suggested Pricing Policy at all times." Amended Complaint, ¶15. To enforce the policy, Defendant refused to sell to retailers who discounted Brighton-brand products below its "suggested" price. Amended Complaint, ¶15. When a retailer offered a promotional discount, Defendant demanded that the retailer revoke the promotion and threatened sanctions. Amended Complaint, ¶16. If a retailer continued to offer discounts, Defendant ceased shipping products and informed the retailer that this cessation would be subject to "review" if the retailer agreed to adhere to the pricing policy. Amended Complaint, ¶17. This policy was extended by Defendant to all Brighton-brand retailers. Amended Complaint, ¶18.[7]

Defendant participated in meetings and conversations to discuss the prices of Brighton-brand products sold in the United States, agreed to charge prices at specified levels and otherwise to increase and maintain prices of Brighton-brand products sold in the United States, issued price announcements and quotations in accordance with the agreements reached, and sold Brighton-brand products to various customers in the United States at non-competitive prices. See Amended Complaint, ¶29. As a result, prices for Brighton-brand products have been maintained at supracompetitive levels from at least 1999 through the present. See Amended Complaint, ¶30.

## IV.    Analysis and Discussion

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states . . . is declared to be illegal." 15 U.S.C. § 1. Though on its face § 1 creates only a criminal penalty, § 4 of the Clayton Act, 15 U.S.C. § 15(a), provides treble damages relief to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." While the language of § 1 could be broadly read, the Supreme Court has limited the reach of § 1 and "outlaw[s] only unreasonable restraints." *State Oil Co. v. Kahn*, 522, 10 U.S. 3 (1997).

Two standards have been articulated by the Supreme Court for testing whether a practice unreasonably retrains trade in violation of § 1. "[T]he first employs a presumption that an agreement is an antitrust violation, thus invoking a *per se* illegality rule to classify the agreement." *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1088 (6th Cir. 1996). Certain types of restraints "are deemed unlawful *per se*." *Khan*, 522 U.S. at 10.

The second standard for testing whether a practice restrains trade in violation of § 1 is the "rule of reason" which "requires the fact finder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Betkerur*, 78 F.3d at 1088 (quoting *Arizona. v. Maricopa County Med.Soc'y.*, 457 U.S. 332, 343 (1982)).

Two types of antitrust conspiracies in restraint of trade have been identified in the relevant case law. Trade restraining agreements scrutinized under the Act can be categorized as horizontal – "agreements between competitors at the same level of market structure," or vertical – "combinations of persons at different levels of the market structure, such as manufacturers and distributors." *Ezzo's Investments, Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 986 (6th Cir. 2001) (quoting *Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991)). Vertical restraints primarily affect intrabrand competition, while horizontal restraints primarily affect interbrand competition. *Ezzo's*, 243 F.3d at 986-87.

In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007), the Supreme Court held that vertical resale price maintenance restraints are to be judged according to the rule of reason rather than the *per se* rule. In doing so, the Supreme Court overruled the holding in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911), which held that resale price maintenance agreements were a *per se* violation of the Sherman Act. Under the rule of reason, "the fact finder weighs all of the circumstances

of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin*, 127 S. Ct. at 2712 (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1997)). "Appropriate factors to take into account include 'specific information about the relevant business' and 'the restraint's history, nature and effect.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "Whether the businesses involved have market power is a further, significant consideration." *Id.* In contrast, "[r]esort to *per se* rules is confined to restraints, like those mentioned [horizontal agreements among competitors to fix prices or to divide markets], 'that would always or almost always tend to restrict competition and decrease output.'" *Id.* at 2713 (quoting *Business Electronics Corp. v. Sharpe Electronics Corp.*, 485 U.S. 717, 723 (1998)). "[T]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Id.*

As noted by the Supreme Court in *Leegin*, "the antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result." 127 S. Ct. at 2718. Moreover, the Court in *Leegin* stated that, in contrast to a situation where "only a few manufacturers lacking market power adopt the practice, . . . [r]esale price maintenance should be subject to more careful scrutiny . . . if many competing manufacturers adopt the practice." *Id.* at 2719 (citing F.M. Scherer & D. Ross, *Industrial*

*Market Structure and Economic Performance* 558 (3d ed. 1990) (finding that "except when [resale price maintenance] spreads to cover the bulk of an industry's output, depriving consumers of a meaningful choice between high-service and low-price outlets, most [resale price maintenance arrangements] are probably innocuous"); Frank H. Easterbrook*, Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 162 (1984) ("stating that "every one of the potentially anticompetitive outcomes of vertical arrangements depends on the uniformity of the practice").

Moreover, although vertical price restraints are to be judged according to the rule of reason, the Supreme Court in *Leegin* made clear that "[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful." 127 S. Ct. at 2717; *see also Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful."). "To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason." *Id.*

"Resale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer." *Id.* at 2717. "The vertical agreements establishing minimum resale prices can have either pro-competitive or anti-competitive effects, depending upon the circumstances in which they are formed." *Id.* The Supreme Court noted, however, in *Leegin,* that "the

8

antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result." *Id.* at 2718. Furthermore, "that a dominant manufacturer or retailer can abuse resale price maintenance for anti-competitive purposes may not be a serious concern unless the relevant entity has market power. If a retailer lacks market power, manufacturers likely can sell their goods through rival retailers . . . and if a manufacturer lacks market power, there is less likelihood it can use the practice to keep competitors away from distribution outlets." *Id.* at 2720.

The defendant Leegin seeks dismissal of the plaintiffs' complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(6). More specifically, defendant alleges (1) that plaintiffs have failed to state either a federal or state claim that will survive scrutiny under the rule of reason analysis because (i) plaintiffs have not made allegations that fit within the Supreme Court's definition of the requisite "relevant market", and (ii) plaintiffs have not alleged any anti-competitive effect from the resale price maintenance agreements; (2) plaintiffs have failed to allege they purchased directly from a participant in a resale price maintenance agreement with Leegin and thus have no standing to assert an antitrust claim under either federal or state law; (3) plaintiffs cannot assert federal claims against Leegin under the United States Supreme Court's ruling in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), which bars indirect purchaser claims; and (4) plaintiffs' unjust enrichment claims are barred because resale price maintenance is not unjust and because plaintiffs have failed to exhaust their

9

remedies against retailers.

Plaintiffs respond by arguing that they allege both a horizontal price fixing conspiracy involving the defendant which violates the *per se* rule of illegality and a *prima facie* case of a vertical price fixing conspiracy involving the defendant, that they allege an appropriate relevant market but that the proper market definition in this case should not be determined until an intensive factual inquiry has been conducted, and that they have alleged sufficient anti-competitive effects and have made sufficient allegations of standing. They further argue that *Illinois Brick* has no application to this case because the plaintiffs are direct purchasers, that they sufficiently state a claim under the Tennessee Trade Practices Act, and that they allege sufficient facts to make out a plausible right to relief for unjust enrichment.

## A. The Alleged Horizontal Conspiracy

As an initial matter, this Court must determine whether plaintiffs allege a horizontal price-fixing conspiracy (*per se* illegal) or a vertical price-fixing conspiracy (subject to a rule of reason analysis). The defendant argues that the resale price maintenance agreements described in plaintiffs' complaint are vertical restraints, "*i.e.* agreements between manufacturers and their distributors rather than between the manufacturers." As such, defendant argues that the recent decision of the United States Supreme Court in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, makes it clear that plaintiffs' claims are subject to a rule of reason analysis. *See* 127 S. Ct. at 2725.

Plaintiffs, not surprisingly, refer to this litigation as "involv[ing] an illegal horizontal and/or vertical price-fixing conspiracy," and allege "that Defendant developed and implemented a minimum price maintenance policy by entering into agreements with other distributors to fix prices." *See* Memorandum In Opposition To Defendant's Motion To Dismiss, [Doc. 17], p. 1. While acknowledging that plaintiffs' original complaint alleged a vertical price-fixing conspiracy under the Sherman Act, plaintiffs argue that their Amended Complaint "alleges a horizontal price-fixing conspiracy between Defendant and its Brighton-brand distributors. Plaintiffs' theory of a horizontal cartel is premised upon the allegation that the defendant is a distributor of its own Brighton Collectibles brand, entered into minimum resale pricing agreements with independent dealers of Brighton Collectibles, and coerced those dealers into selling at specified minimum resale prices through threats of economic sanctions and intimidation." *Id.*, pp. 3-4.[1]

The practical significance of the issue is fully recognized by the plaintiffs. If the complaint of the plaintiffs alleges a horizontal conspiracy, then that horizontal conspiracy to fix prices is *per se* unlawful. *Leegin*, 127 S. Ct. at 1213. If defendant is engaged in a horizontal conspiracy, which is *per se* illegal, plaintiffs need not establish or plead a relevant market or anti-competitive effects. If the alleged conspiracy is a vertical price-fixing conspiracy, then the rule of reason applies and plaintiffs must plead and establish

---

[1] That plaintiffs now characterize this litigation as involving a horizontal conspiracy is of little relevance. The Court must examine the factual allegations made by plaintiffs rather than the labels plaintiffs place on defendant's conduct.

a relevant market and anti-competitive effects of the conspiracy.  *See Care Heating &
Cooling, Inc. v. American Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005);  *see also
FTC  v. Superior Ct. Trial Lawyers Ass'n.,* 493 U.S. 411, 432-36 (1990).

Here, plaintiffs allege an agreement between defendant, a manufacturer which also
distributes some of its own products, and other distributor retailers who distribute
plaintiffs' products.  Plaintiffs rely on *United States v. McKesson & Robbins*, 51 U.S. 312
(1995) in arguing that "contracts between competitors, *e.g.*, Defendant and its independent
retailers, are not saved from the *per se* rule of illegality because one of the competitors,
*i.e.*, the Defendant, distributes to the other." Plaintiffs' reliance on *McKesson*, however,
is misplaced.  *McKesson* involved a complaint by the government which alleged that
McKesson & Robbins' fair trade agreements with its independent wholesalers with whom
it was in competition constituted illegal price-fixing in violation of § 1 of the Sherman
Act.  McKesson & Robbins was a manufacturer of its own line of drug products and was
the largest drug wholesaler in the United States.  Operating through wholesale divisions,
McKesson & Robbins sold drugs and other merchandise of various brands to retailers,
principally drug stores.  McKesson & Robbins distributed its own brand products to
retailers through two channels: (1) directly to retailers and (2) through independent
wholesalers.  The major portion of its brand products was distributed to retailers through
its own wholesale divisions.  McKesson & Robbins required all retailers of its brand
products to sell them at "fair trade" retail prices fixed by the manufacturer.  McKesson &

Robbins admitted the existence of the contracts but claimed they were exempted from the Sherman Act by the Miller-Tydings Act and the McGuire Act.

The issue before the Supreme Court was one of statutory interpretation. The Miller-Tydings Act exempted from the reach of the Sherman Act certain resale price maintenance contracts entered into by manufacturers of branded or trade-marked goods so long as the agreements were not between persons, firms, or corporations in competition with each other. The McGuire Act contained an almost identical provision. The Supreme Court held that McKesson & Robbins, which distributed its own brand products directly to retailers and through independent wholesalers, was competing at the same functional level with each of the independent wholesalers, and hence, the price-fixing agreement entered into by the company with wholesalers was not rendered valid by the Miller-Tydings and McQuire Acts. The *McKesson* decision did not address or discuss whether the restraints at issue were horizontal or vertical for Sherman Act purposes and its analysis has little, if any, application to the issue before the Court.

Leegins' retailing strategy is known as "dual distribution," *i.e.*, a manufacturer who "operates a branch of dealership on the same market level as one or more of its customers." *See Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1201 n.14 (6th Cir. 1982). Plaintiffs argue in their amended complaint that Leegin's "participat[ion] in the retail market" transforms its retail price maintenance policy into a horizontal restraint. That argument has previously been considered and rejected, however, by the Sixth Circuit

13

in *International Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 906 (6th Cir. 1989), *cert. denied*, 494 U.S. 1066 (1990). Plaintiffs in *International Logistics* engaged in buying and reselling Chrysler manufactured and compatible automotive replacement parts for use in Chrysler manufactured vehicles.

Chrysler sold its "Power Master Engine" to plaintiffs for export at a price determined by the overseas market. The export price was less than the domestic price. Chrysler learned that plaintiffs were selling the Power Master Engine to domestic purchasers at the lower price. Chrysler's dealers complained because they could not purchase the engine for the same price as plaintiffs and plaintiffs were terminated as distributors of Chrysler parts. Plaintiffs then sued Chrysler, claiming that Chrysler imposed illegal restraints on vendors who manufactured and sold automotive parts to Chrysler, that Chrysler imposed illegal restraints on distributors who bought parts from Chrysler and that Chrysler illegally monopolized or attempted to monopolize the market, all in violation of §§ 1 and 2 of the Sherman Act. *International Logistics*, 884 F.2d at 905; *International Logistics Group, Ltd. v. Chrysler Corp.*, 1988 WL 106905, *1-*2 (E.D. Mich. 1988).

The Sixth Circuit held that Chrysler's marketing policies were vertical non-price restraints not directed toward or designed to impose restraints at the same competitive level even though Chrysler, the manufacturer, was also a distributor. Because they are considered vertical, companies involved in a dual distribution situation are analyzed under

a rule of reason standard, "in the same manner as other vertical restraints." *International Logistics*, 884 F.2d at 906; *Service Merchandise*, 686 F.2d at 1201. Similarly, in *Service Merchandise*, the Sixth Circuit held that a dual distributorship situation should be analyzed under a rule of reason test. *Service Merchandise*, 686 F.2d at 1201-02. The Sixth Circuit noted that the restrictions imposed showed a potential for increasing interbrand competition, and thus should be considered vertical. *Id.* In reaching this conclusion, the *Service Merchandise* court noted that several courts analyzing cases involving a dual distribution situation have applied the rule of reason standard. *Id.* at 1201, citing *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir. 1982); *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2nd Cir. 1981); *United States v. Koppers Co., Inc.*, 652 F.2d 290 (2nd Cir.), *cert. denied*, 454 U.S. 1083 (1981); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir. 1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir.), *cert. denied*, 454 U.S. 827 (1981). Here, because Leegin operates at the market level as both a manufacturer and a distributor, it is involved in a dual distribution situation. Given the dual distributorship situation present in this case, this Court holds that application of a *per se* analysis would be inappropriate as a matter of law, and the appropriate standard is the rule of reason.

Additionally, this is not a case where the source of the conspiracy is a combination of distributors. Only where "the source of the conspiracy is a combination of the distributors" can a vertical restraint be characterized as horizontal. *Red Diamond Supply,*

*Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir. 1981). Although plaintiffs characterize their action as a price-fixing conspiracy among Brighton Collectible retailers, they affirmatively allege that Leegin adopted retail price maintenance for its own purposes and coerced retailers to accept its policy. Where the manufacturer "impose[s] an agreement on its distributors . . . that agreement is a vertical one, and the restrictions imposed are vertical restrictions." *Id.* at 1004. Because the plaintiffs plead a vertical conspiracy, plaintiffs must establish both the relevant market and anti-competitive effect.

## B.    The Relevant Market

The threshold question in any rule of reason antitrust case is definition of the relevant market. An antitrust plaintiff must identify both the relevant geographic market and the relevant product market. *Stratmore v. Goodbody*, 866 F.2d 189, 194 (6th Cir. 1989). The plaintiff must identify the relevant geographic market, meaning the "area in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Electric Co. v. National Coal Co.*, 365 U.S. 320, 327 (1961). The relevant product market means the line of goods or services reasonably interchangeable in use. *United States v. E.I. DuPont DeNemours & Co.*, 351 U.S. 377, 404 (1954). A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced-price, use and qualities considered." *Id.* ("Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one

commodity for another."). "[I]t is the use or uses to which the commodity is put that control." *Id.* at 396.

Market definition is the threshold issue because "[w]ithout a definition of that market there is no way to measure" a defendant's market power in the relevant product market. *Walker Process Equip., Inc. v. Ford Mach. and Chem. Corp.*, 382 U.S. 172, 177 (1965); *Foundation For Interior Design Educ. Research v. Savannah College of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001). In the absence of market power in the relevant market, a company does not have the ability to undermine competition. "Without market power, a firm cannot have an adverse effect on competition." *Ezzo's*, 243 F.3d at 988 (quoting *Davis -Watkins*, 686 F.2d at 1202).

All of plaintiffs' federal antitrust claims under § 1 of the Sherman Act require that plaintiffs define the relevant market. *International Logistics Group,* 884 F.2d at 907. Plaintiffs define the relevant markets in paragraphs 49-51 of their FAC. They define the relevant geographic market as the United States or, alternatively, Tennessee. (FAC, ¶ 49). Definition of the geographic market is not in dispute for the purposes of the instant motion. Plaintiffs define the relevant product market as "the market for the manufacture, distribution and/or sale of Brighton-brand products," a line of clothing accessories, including handbags, leather belts, shoes, fragrance, wallets, watches, jewelry and sunglasses manufactured and distributed by the defendant. (FAC, ¶¶ 1, 49). "Brighton-brand products are unique. Many consumers do not consider other accessories suitable

17

substitutes for their use of Brighton-brand products, nor would they substitute other accessories for Brighton-brand products, nor would they do so even in response to a significant, non-transitory increase in the price of Brighton-brand products." (FAC, ¶ 50). Defendant markets its products as "one-of-a-kind ornamentation" and claim that "Brighton is the only major accessories line featuring products that coordinate from head to toe." (FAC, ¶ 23). According to plaintiffs, Brighton-brand products are characterized by inelasticity of demand. (FAC, ¶ 51).

Defendant contends that plaintiffs define a "facially implausible market." Plaintiffs respond that they plead a plausible relevant product market because Brighton products are unique, and there are no substitutes which have reasonable interchangeability. Plaintiffs additionally argue that interchangeability is a fact-intensive inquiry which should not be decided on a motion to dismiss.

As an initial matter, "[f]ailure to identify a relevant market is a proper grounds for dismissing a Sherman Act claim." *Nat'l Hockey League Players Ass'n. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003). A complaint should be dismissed "if the definition of the relevant market in the complaint is implausible or not tenable." *Foundation For Interior Design Educ. Research v. Savannah College of Art & Design*, 73 F.Supp.2d 829, 837 (W.D. Mich. 1999); *see also Cupp v. Alberto-Culver USA, Inc.*, 310 F.Supp.2d 963, 972 (W.D. Tenn. 2004). In addition, further factual inquiry through discovery will add nothing to the question before the Court. It is patently obvious

from the face of the complaint that the plaintiffs' definition of the relevant product market is deficient and cannot be cured. It is just as obvious that other product lines of women's accessories made by other manufacturers are reasonably interchangeable substitutes for Brighton-brands. While Brighton-brands may enjoy some market loyalty, it cannot reasonably be argued that other handbags, wallets, shoes, jewelry and the like do not serve the same purpose and have the same use as Brighton-brand products. Requiring plaintiffs to provide more factual support for their conclusory allegations in their complaint is just the kind of "threshold of plausibility" the Supreme Court required in *Twombly*.

Plaintiffs in essence argue here that Brighton products constitute a market by themselves because of customer loyalty and an alleged reluctance on the part of consumers to consider substitute products manufactured and distributed by other manufacturers of women's accessories. Furthermore, they contend that defendant's advertising strategy and advertising slogans, *i.e.* "one-of-a-kind ornamentation" and "the only major accessories line featuring products that coordinate from head to toe," create uniqueness, without consideration of the functional interchangeability of similar products, *i.e.* handbags, wallets, watches, sunglasses, etc. manufactured by other manufacturers. In other words, as defendant notes, "plaintiffs insist that popular products are antitrust markets to themselves." This Court agrees with defendant. Plaintiffs' position is not an accurate statement of the law.

The Supreme Court has made it clear that definition of the relevant product market

includes "products that have reasonable interchangeability." *DuPont*, 351 U.S. at 404.[2]

Notably, plaintiffs do not allege, even in conclusory fashion, that there are no reasonably interchangeable substitutes, only that many Brighton customers would not consider other accessories as suitable substitutes and would not substitute other products. It is quite clear that plaintiffs cannot plausibly allege that other clothing accessories such as handbags, leather belts, shoes, fragrances, wallets, watches, jewelry and sunglasses are not reasonably interchangeable.[3] No amount of discovery would dispel such an obvious notion. If the plaintiffs were correct, as defendant argues, a whole host of products which enjoy brand loyalty, such as Pepsi, Coca Cola, Rolex watches, fast foods, Chevrolet, Ford, Chrysler, Volkswagon, and Dodge automobiles, office supplies, ice cream, and the like would all become relevant product markets for antitrust purposes.[4] Plaintiffs ignore,

---

[2] Many cases also refer to cross-elasticity of demand as important to defining the relevant market. *See, e.g., Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3rd Cir. 1997). Cross-elasticity of demand refers to the relationship between the price of one product and the demand for another. The cross-elasticity of demand between two products is high if an increase in one's price causes an increase in the other's demand. *See* Philip A. Freeda & Herbert Hovencamp, *Antitrust Law:* An Analysis of Antitrust Principles and Their Applications ¶ 562. Plaintiffs do allege, at paragraph 43 of the FAC, that "Brighton-brand products are distinct products characterized by an inelasticity of demand." Plaintiffs have not, however, alleged facts which explain their conclusory allegation. This is precisely the type of conclusory allegations the Supreme Court cautioned against in *Twombly*, 127 S. Ct. at 1966 ("[s]omething beyond the mere possibility of [relief] must be alleged lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.")

[3] Plaintiffs also ignore the obvious defect in their attempt to group products with widely disparate uses in a single market. As defendant properly notes, picture frames do not compete with women's handbags and shoes do not compete with jewelry.

[4] See, e.g.,, *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3rd Cir.) *en banc, cert. denied*, 506 U.S. 868 (1992); *Tunis Bros. Co.v. Ford Motor Co.*, 952 F.2d 715, 723-27 (3rd Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992); *International Logistics Group v. Chrysler Corp.*, 884 F.2d 904, 908 (6th Cir. 1989), *cert. denied*, 494 U.S. 1066 (1990); *Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*, 1997–2 Trade Cas. (CCH) ¶ 71, 891, at 80, 296 (N.D. Calif. 1997); *Smith & Johnson, Inc. v. Hedaya Home Fashions, Inc.*,

however, volumes of case law which reject such a conclusion.

Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes. *Little Caesar Enterprises, Inc. v. Smith*, 34 F.Supp.2d 459, 477 n. 30 (E.D. Mich. 1998); *A.I. Root v. Computer Dynamics*, 615 F.Supp. 727, 733 (N.D. Ohio 1985), *aff'd* 806 F.2d 673, 675-76 (6th Cir. 1986); *General Business Sys. v. North American Phillips Corp.*, 699 F.2d 965, 972–75, 977-78 (9th Cir. 1983); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672-73 (7th Cir. 1985), *cert. denied*, 475 U.S. 1129 (1986). Plaintiffs respond to this clear precedent by arguing that "courts sometimes agree that what appear to be mere differentiations are in fact sufficient to be characterized as relevant markets unto themselves," citing 1 Areeda*, Fundamentals of Antitrust Law*, § 5.11(a) p. 194 (2002). They also argue that courts have not "foreclosed the possibility that under some circumstances, the relevant market could consist of just one brand of a product." In support of their position they cite to three cases, *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 101-02 (1984), *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 998 (11th Cir. 1993), and *Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 250-51 (1959). These cases offer no support, however, for

---

1997-1 Trade Cas. (CCH) ¶ 71, 696, at 78, 962 (S.D. N.Y. 1996); *Regency Oldsmobile, Inc. v. General Motors Corp.*, 723 F. Supp. 250, 267-68 (D. N.J. 1989); *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 843 (D. Minn. 1989); *Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, 1989–1 Trade Cas. (CCH) ¶ 68, 560, at 60, 998 (S.D. N.Y. 1989); *Coca-Cola Bottling Co. v.Coca-Cola Co.*, 696 F. Supp. 97, 131–132 (D. Del. 1988); *Lynch Business Machines, Inc. v. AB Dick Co.*, 594 F. Supp. 59, 67 (N.D. OH 1984).

plaintiffs' position that a single brand can constitute a relevant product market. In *NCAA* and *Int'l Boxing Club*, the Court found that an entire sport was the relevant product market and found competing members of the sport to be in horizontal cartels. These cases, in fact, illustrate the reluctance of the courts to define a relevant product market in terms of one brand product or the product of a single supplier. If the rationale of these cases were applied to the instant case, they would inevitably lead to the conclusion that the relevant product market in this case is, at best, women's accessories produced by all manufacturers.[5]

Plaintiffs also rely on *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). In *Kodak*, plaintiffs, independent service organizations ("ISOs"), repaired and serviced Kodak copying machines and micrographic equipment, sold Kodak parts and sold used Kodak equipment. Kodak's photocopier and micrographic equipment is unique, and Kodak parts are not compatible with equipment made by other manufacturers. *Id.* at 456-57. Defendant Kodak also provided service and parts for its machines to its customers. Kodak adopted policies which limited the sale of replacement parts for its equipment to "buyers of Kodak equipment who use Kodak service or repair their own machines" and limited the ISO's access to other sources of Kodak parts. The ISOs brought an antitrust action alleging that Kodak violated § 1 of the Sherman Act with its illegal tying practices and violated § 2 of the Sherman Act through its unlawful

---

[5] See footnote 3.

monopolization and attempted monopolization of Kodak parts. *Id.* at 458. Kodak argued

that monopoly power did not exist because a single brand of a product can never constitute

a relevant product market under the Sherman Act. The Supreme Court rejected Kodak's

position stating:

> Because service and parts for Kodak equipment are not inter-
> changeable with other manufacturers' service and parts, the
> relevant market from the Kodak-equipment owners perspective
> is composed of only those companies that service Kodak
> machines. This Court's prior cases support the proposition that
> in some instances one brand of a product can constitute a
> separate market.

*Id.* at 482. (citations omitted).[6]

The *Kodak* case does establish the principle that one brand of a product can, under

some circumstances, constitute the relevant market when the product is unique and ***no***

***reasonable substitutes exist***. The case before this Court is not such a case, and the

plaintiffs make no such allegation in their complaint. In effect, the Court said the market

could be limited to customers that owned Kodak copiers because once they bought a

Kodak copier they were locked into buying only Kodak parts and service for that copier.

*Id.* at 481-82.[7] Those courts which have found markets to be limited to the products of a

---

[6]     This statement of the Supreme Court's holding in *Kodak* is from the Sixth Circuit's decision in *Tarrant Service Agency, Inc. v. American Standard, Inc.,* 12 F.3d 609 (6th Cir. 1993).

[7]     In fact, the Sixth Circuit, in examining the *Kodak* decision, appears to have found the "lock-in effect of Kodak's restrictive parts policy to be largely determinative in *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997)(finding the primary equipment market to be the relevant market and holding "that an antitrust plaintiff cannot succeed on a Kodak-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies").

single supplier have done so only upon factual allegations that the products were so unique or so dominant in the market that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed. *See Cutters Exchange v. Durkoppwerke GmbH*, 1986-1 Trade Cas. (CCH) ¶ 67, 039, at 62, 389 (M.D. Tenn. 1986). Plaintiffs have not plausibly pled any facts to support even a conclusory allegation that the Brighton products are so unique that there are no substitutes reasonably interchangeable with them in the market.

Plaintiffs' failure to plausibly define the relevant product market is fatal to their claims under the federal antitrust statutes. Ordinarily, this Court would provide an opportunity to plaintiffs to amend their pleadings to correct such a deficiency; however, plaintiffs have in fact amended their complaint after the filing of the defendant's motion to dismiss in this case and have been unable to plausibly allege an appropriate relevant product market. *See Keweenaw Bay Indian Cmty. v. Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993). Therefore, the plaintiffs' federal antitrust claims will be dismissed.

### C.    Anticompetitive Effects.

As set forth above, plaintiffs must also establish the anticompetitive effect of the resale price maintenance agreements at issue in this case. Defendant argues, and plaintiffs do not dispute, that plaintiffs allege only that the agreements resulted in higher prices for Brighton products. The Supreme Court made it clear in *Leegin*, however, that higher prices alone, "absent a further showing of anticompetitive conduct," are insufficient

evidence of anticomptitive effect in the context of a resale price maintenance agreement. *Leegin*, 127 S. Ct. at 2718.

Both parties further agree on the circumstances under which higher retail prices might be anticompetitive-manufacturer cartels, retailer cartels, a dominant retailer, or a manufacturer with market power seeking to exclude small competitors. Defendant argues that plaintiffs have pled none of the circumstances. Plaintiffs, on the other hand, contend they have alleged that defendant and distributors formed a retail cartel, an allegation sufficient to survive defendant's motion to dismiss.[8]

Plaintiffs appear to argue that Leegin's dual distribution system is sufficient to establish the further showing of anticompetitive conduct required by the Supreme Court. Plaintiffs argue that "Defendant's restraints are not purely vertical but horizontal as well. Defendant owns and operates dozens of its own Brighton Collectable Stores all of which compete directly with approximately 6,000 independent retailers who also sell Brighton-brand products. Thus, defendant appears to have crafted a horizontal price-fixing agreement *to protect its own stores* from competition with other retailers." Secondly, they refer to an open letter from FTC Commissioner Harbour concerning "bargain–hunting consumers" and their shopping preferences. Defendant responds that plaintiffs

---

[8] Plaintiffs initially argue that "defendant fails to identify how its vertical minimum resale pricing activities have benefitted consumers." Memo. in Opposition, [Doc. 17], p. 16. This argument, however, improperly attempts to shift the burden on the issue of anticompetitive effect to the defendant. The burden is on the plaintiffs to plead and establish that Leegin resale price maintenance agreements have anticompetitive effects.

"mischaracterize" the concept of a retailer cartel.

As an initial matter, it is not at all clear that the Court can consider the contents of the Harbour letter in deciding defendant's Rule 12(b)(6) motion to dismiss. As a general rule, the Court cannot consider matters outside the pleadings without converting the motion to one for summary judgment. Even if, however, the Court considers the letter, it really adds nothing to the debate. The letter simply contains the opinion of a member of the Federal Trade Commission, an opinion already rejected by the Supreme Court.

Secondly, there really is no confusion about how the Supreme Court defines a retailer cartel. In *Leegin*, the Supreme Court said:

> Vertical price restraints also "might be used to organize cartels at the retailer level." *Business Electronics, Supra,* at 725-726, 108 S. Ct. 1515. A group of retailers might collude to fix prices to consumers and then to compel a manufacturer to aid the unlawful arrangement with resale price maintenance. In that instance the manufacturer does not establish the practice to stimulate services or to promote its brand but to give inefficient retailers higher profits. Retailers with better distribution systems and lower cost structures would be prevented from charging lower prices by the agreement . . . .

*Leegin*, 127 S. Ct. at 2717. Plaintiffs do not allege a retailer cartel as defined by the Supreme Court. There is no allegation by plaintiffs here that retailers have agreed to fix prices and then compelled the manufacturer, Leegin, to utilize resale price maintenance. In fact, plaintiffs have affirmatively alleged the opposite, *i.e.*, that Leegin coerced retailers and forced upon retailers the resale price maintenance agreements.

Thus, plaintiffs' complaint does not plausibly plead either a relevant market or anticompetitive effects of the resale price maintenance agreements. For this reason also, plaintiffs' federal claims against the defendant must be dismissed.

**D.     The State Law Claims.**

**1.     The Tennessee Trade Practices Act Claim.**

In Count III of their complaint, plaintiffs assert a state antitrust claim under the Tennessee Trade Practices Act ("TTPA"). Defendant argues that the state law antitrust claim should be dismissed for the same reasons as the federal Sherman Act claims. Plaintiffs respond that Tennessee's antitrust laws have developed "independently of federal law," that the "TTPA often has a more far-reaching construction than the Sherman Act" and that "[t]he *Leegin* decision did not change state laws relating to minimum resale price maintenance cases, and therefore, a plan that complies with federal antitrust laws may nevertheless violate Tennessee law."

The TTPA, codified at Tennessee Code Annotated § 7-25-101, provides:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combination between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

T.C.A. § 47-25-101. Tennessee Code Annotated § 47-25-102 also prohibits "any other arrangements, contracts, or agreements, by and between its agents and subagents, which tend to lessen full and free competition in the sale" of articles manufactured in and imported into the state. Tennessee Code Annotated § 47-25-106 provides for a civil remedy against those who violate the TTPA by those injured or damaged by the violation. T.C.A. § 47-25-106.

Neither plaintiffs nor defendant devotes any significant portion of their respective briefs to a discussion of the TTPA claim. Their limited discussion is directed primarily to the question of whether or not the standard of liability under the Tennessee antitrust law is the same as under federal law, which defendant asserts, or whether the reach of the Tennessee statute is broader and more far reaching than the federal antitrust statutes, which plaintiffs argue. While it does not appear necessary for this Court to address such a broad question, the Court is constrained to agree with plaintiffs that the Tennessee Supreme Court has already, in at least one circumstance, extended the reach of the TTPA beyond that permitted by the Supreme Court's interpretation of the Sherman Act. *See Freeman Industries, LLC v. Eastman Chemical Company*, 172 S.W.3d 512 (Tenn. 2005).

That, however, does not resolve the issue before the Court. At issue in this case are minimum resale price maintenance agreements and, so far as this Court can tell, no Tennessee court has ever analyzed the application of the TTPA to such agreements.

Therefore, the Court is without guidance from any reported Tennessee decision on the question of whether the Tennessee courts will analyze resale price maintenance agreements as horizontal restraints which are *per se* illegal or under the rule of reason. The plaintiffs suggest, without any citation of authority or analysis, that the Tennessee courts will not follow the Supreme Court's holding in *Leegin*. Defendant, on the other hand, suggests that the Tennessee courts are likely to do just that in view of the fact that every Tennessee case decided under the TTPA has relied heavily on federal precedent. (*See* plaintiffs' reply brief in support of motion to dismiss, pp. 15-16, for collection of Tennessee cases relying on federal precedent).

This Court finds defendant's argument to be persuasive. Plaintiffs have asserted no good reason why the Tennessee courts would not follow the holding of the United States Supreme Court in *Leegin* and analyze resale price maintenance agreements under the rule of reason. As a result, it is incumbent upon plaintiffs to establish a relevant product market and their failure to do so is as fatal to their claims under the TTPA as under the federal statutes. For that reason, the TTPA claim will be dismissed.[9]

## 2. Unjust Enrichment.

---

[9] Indeed, the only case which the parties have cited or which this Court could locate which applies a standard of liability different from that established under the federal antitrust statutes is *Freeman Industries, LLC v. Eastman Chemical Company*. The *Freeman* case, however, deals with a question of statutory interpretation peculiar to the language of TTPA. Nothing in the language of Tennessee Code Annotated § 47-25-101, however, deals with the question of whether to examine resale price maintenance agreements through a *per se* analysis or the rule of reason. As the Tennessee Supreme Court points out in *Freeman*, states may provide a remedy under their state antitrust statutes which is not provided by the federal antitrust statutes. *Freeman*, 172 S.W.3d at 518-19. This is not one of those cases, however, where it appears that the Tennessee Legislature has, by statute, extended the reach of the state antitrust statute beyond that of the federal antitrust law.

Count IV of plaintiffs' complaint is a claim for unjust enrichment under Tennessee state law. Plaintiffs allege that, as a result of Leegin's use of resale price maintenance agreements, "plaintiffs and the class members conferred a benefit upon defendant, and defendant received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit defendant to retain this benefit without paying its reasonable value to plaintiffs and the class members."

Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not otherwise exist. *Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154-55 (Tenn. 1966)). Such contracts are not based upon the intention of the parties but are obligations created by law and are "founded on the principle that a party receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." *Paschall's*, 407 S.W.2d at 154.

The Tennessee Supreme Court recently set out the elements of an unjust enrichment claim in its decision in the *Freeman* case, as follows:

> The elements of an unjust enrichment claim are: 1) "[a] benefits conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitably for him to retain the benefit without payment of the value thereof." *Paschall's Inc.*, 407 S.W.2d at 155. The most significant requirement of an unjust enrichment

claim is that the benefit to the defendant be unjust. *Id.*; *Whitehaven Comty. Baptist Church*, 973 S.W.2d at 596. The plaintiff must further demonstrate that he or she has exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract. *Paschall's Inc.*, 407 S.W.2d at 155; *Whitehaven Comty. Baptist Church*, 973 S.W.2d at 596.

*Freeman*, 172 S.W.3d at 525.

A plaintiff need not be in privity with a defendant to recovery under a claim of unjust enrichment. *Paschall's Inc.*, 407 S.W.2d at 1554. Likewise, a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile. *Freeman*, 172 S.W.3d at 526.

Plaintiffs' unjust enrichment claim fails in this case because plaintiffs have not exhausted all remedies against the retailers with whom they have privity of contract and have not provided a factual basis to support their conclusory allegation that exhaustion of remedies is not required in the case. When discussing the exhaustion of remedies requirement, the Tennessee Supreme Court in the *Freeman* case acknowledged that exhaustion of remedies was not necessary if "the pursuit of the remedies would be futile." Plaintiffs, in their first amended complaint, plead that "[t]o the extent plaintiffs are required by any state's law to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because (a) the issues are of the type that would be appropriate for judicial determination, (b) the plaintiffs would suffer substantial hardship if compelled to exhaust his remedies,

and (c) applying the doctrine here would result in substantial inequity and economic inefficiency and violate public policy." FAC, ¶ 84.

Plaintiffs' position is without merit for several reasons. First of all, the Tennessee Supreme Court in *Freeman* recognized only a single exception to the requirement that remedies be exhausted against the party with whom the plaintiff is in privity, *i.e.* futility. Once again, plaintiffs argue that a motion to dismiss is typically not an appropriate vehicle for testing such an allegation, citing a district court case from the Northern District of Illinois, *Muehlbauer v. GMC*, 431 F.Supp.2d 847, 854 (N.D. Ill. 2006). Plaintiffs' argument overlooks language of the Supreme Court in *Freeman* which suggests otherwise, however. Although the issue in *Freeman* was one of summary judgment, the Supreme Court, in examining plaintiffs unjust enrichment claim in that case, stated as follows: "We do not believe, however, that a bare allegation that any attempt to exhaust its remedies . . . would be futile without providing a factual basis to support the allegation is sufficient to establish a disputed issue of material fact as to the exhaustion-of-remedies element . . . ." *Freeman*, 172 S.W.3d at 526. This Court fails to discern any reason why such a pleading requirement would not apply equally in considering a Rule 12(b)(6) motion, especially in view of the Supreme Court's recent pronouncement in *Twombly*.

Secondly, plaintiffs' allegations of hardship, amenability of the claims to judicial determination and equity, inefficiency and violation of public policy are not exceptions which have been recognized by the Tennessee courts to the exhaustion of remedies

requirement.  Even if they were, plaintiffs here, as in *Freeman*, have provided no factual basis to support their allegations.  Thus, it appears that plaintiffs admit that they have not exhausted their remedies against the retailers with whom they are in privity, and their complaint fails to plead an essential element of the cause of action of unjust enrichment under Tennessee law.  Additionally, plaintiffs' complaint attempts to allege an exception to the exhaustion requirement in conclusory fashion only without specific factual allegations to support such claims.  As a result, plaintiffs' unjust enrichment claims under Tennessee law fail as well.

## V.    Conclusion.

For the reasons set forth above, defendant's Rule 12(b)(6) motion to dismiss,  [Doc. 3], will be **GRANTED,** and plaintiffs' complaint and first amended complaint will be **DISMISSED**.

A separate judgment will enter.

So Ordered.

Enter:


                                    s/J. RONNIE GREER
                                    UNITED STATES DISTRICT JUDGE